**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KATHERINE STONICK,<br>        *Plaintiff*, | 3:17-cv-01365 (KAD) |
| v. | |
| ASHLEY DELVECCHIO, DAVID<br>FARRELL,<br>        *Defendants.* | February 7, 2020 |

**MEMORANDUM OF DECISION**
**RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 38)**

Kari A. Dooley, United States District Judge:

Plaintiff Katherine Stonick ("Stonick") filed this action against Ashley DelVecchio ("DelVecchio") and David Farrell ("Farrell"), who at all relevant times served as a police officer and lieutenant for the Town of Westport, Connecticut, respectively, (together, the "Defendants") alleging violations of her civil rights guaranteed by the United States and Connecticut Constitutions, as well as state law claims for defamation and malicious prosecution.[1] (*See* Second Am. Compl. ("SAC"), ECF No. 16.) Pending before the Court is Defendants' motion for summary judgment (ECF No. 38), to which Stonick has objected.[2] (ECF No. 39.) For the reasons set forth below, Defendants' motion is DENIED in part and GRANTED in part.

**Material Facts**

The following facts are drawn from the parties' Local Rule 56(a) Statements of Undisputed Material Facts and exhibits in the record.

---

[1] The original complaint also named Lieutenant Jillian Cabana, Chief of Police Foti Koskinas, and the Town of Westport as Defendants. Stonick abandoned these claims in her amended pleadings.
[2] Oral argument was held on July 17, 2019.

On August 23, 2016, Jose Paccha ("Paccha") reported to Officer DelVecchio that on August 17, 2016 he met a woman with whom he had been corresponding through an online dating website for dinner at a Westport restaurant. (Defs.' Stat. ¶¶ 3–4, ECF No. 38-9.) The online profile picture of the woman with whom Paccha believed he was corresponding was identified as "Sophie." (*Id.* ¶ 3.) Paccha reported that he later discovered that a $300 gift card had been charged to his bill, in addition to the cost of dinner. (*Id.* ¶ 5.) DelVecchio met with Andre Lodice ("Lodice") and Scott Ziskroit ("Ziskroit"), the owner and waiter of the restaurant, respectively, the day after Paccha's police report. (*Id.* ¶ 6.) Lodice admitted that the woman had asked him to add the gift card charge to the bill and that he ran the charge on Paccha's credit card at the counter, not at the table where the couple had eaten dinner. (*Id.* ¶ 7.) Ziskroit provided a sworn handwritten statement in which he declared that the same young woman came back to the restaurant three separate times asking for bottles of wine and vodka, prompting suspicions. (Pl.'s Ex 3, ECF No. 39-4.) DelVecchio, however, reported that Ziskroit stated that the suspect only came back on two subsequent nights, each time with a different man, and that she used the gift card to pay for their meals. (Incident Report at 7, Defs.' Ex. D, ECF No. 38-5.)

DelVecchio obtained the suspect's license plate number from Paccha, which revealed that the license plate was registered to Stonick's parents and that a woman named Kaylee Stonick (*i.e.*, "Stonick") between the ages of twenty-five and twenty-nine resided at the address on the registration. (Defs.' Stat. ¶¶ 8–9.) On September 1, 2016, the police administered a photographic array to Ziskroit. (*Id.* ¶ 11.) He selected a woman who is not Stonick as the suspect, indicating that he was "certain" it was the woman who had purchased the gift card. (*Id.* ¶¶ 11–12.) The following day, a separate photographic array was shown to Paccha, from which he identified

Stonick as the suspect. (*Id.* ¶ 13.) The image of Stonick used in the array was from a DMV photo obtained by the Westport police. (Incident Report at 8.)

Paccha also forwarded an email from the dating website to DelVecchio purportedly showing a picture of the woman with whom he had been corresponding. (Defs.' Stat. ¶ 14.) While Defendants claim that Paccha told DelVecchio that the woman in the picture was the same woman he met for the date (*id.*), Stonick highlights a discrepancy in this contention. According to the affidavit accompanying DelVecchio's subsequent arrest warrant application, Paccha also indicated that he realized during the date that the woman on the date was not the same person as the woman in the online photo. (Pl.'s Stat. ¶ 14a, ECF No. 39-1; *see* DelVecchio Aff. ¶ 4, Defs.' Ex. C, ECF No. 38-4; DelVecchio Response to Pl.'s Interrogs. # 8, Defs.' Ex. H, ECF No. 42-1.) In light of Paccha's identification, DelVecchio did not think to search for other members of the Stonick household. (Defs.' Stat. ¶ 15.)

DelVecchio subsequently left two voice messages at the Stonick residence on September 16 and 21, 2016. (*Id.* ¶¶ 16–18.) On the day of the second call, Stonick called DelVecchio back and left a voice message. (*Id.* ¶ 20.) DelVecchio returned the call the next day—September 22, 2016—and left a voice message, which Stonick did not return. (*Id.* ¶ 21.) On that same day, DelVecchio applied for an arrest warrant for Stonick based upon her professed probable cause to believe Stonick had committed larceny in the sixth degree and illegal use of a credit card in violation of Conn. Gen. Stat. §§ 53a-125b and 53a-128d, respectively.[3] (*Id.* ¶ 22.) The arrest warrant affidavit did not state that Ziskroit had identified a different female who was not Stonick

---

[3] An individual commits sixth-degree larceny "when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner" and the value of the property is $500 or less. Conn. Gen. Stat. §§ 53a-119; 53a-125b. A person commits illegal use of a credit card when he, *inter alia*, "obtains money, goods, services or anything else of value by representing without the consent of the cardholder that such person is the holder of a specified card." *Id.* § 53a-128d(2).

from a photographic lineup. (DelVecchio Dep. at 28:17, Pl.'s Ex. 6, ECF No. 39-7.) Stonick did not return DelVecchio's call of September 22 until after the warrant application was already signed. (Defs.' Stat. ¶ 25.) Despite her failure to speak with Stonick, DelVecchio believed she had probable cause for Stonick's arrest. (*Id.* ¶¶ 23–24.)

Assistant States Attorney Suzanne Vieux ("Vieux") submitted DelVecchio's application to the court and believed, at the time, that it was supported by probable cause, given Paccha's identification of Stonick from a police photographic lineup and other information, regardless of whether or not Ziskroit had been able to identify Stonick. (*Id.* ¶ 32.) It was Vieux's general practice to consult the accompanying police incident report to resolve any lack of clarity in an officer's affidavit in support of an arrest warrant application and, if necessary, to instruct the officer to add information from the incident report to the affidavit. (*Id.* ¶ 30.) The parties dispute whether DelVecchio submitted an incident report to Vieux, though they agree that police officers often provide such reports to the State's Attorney's Office in connection with arrest warrant applications and that DelVecchio had been instructed to submit one as a rule. (*Id.* ¶¶ 27–29; Pl.'s Stat. ¶¶ 27a–29a.) Stonick represents that she obtained a certified copy of her criminal file and that it did not include a copy of the incident report. (Stonick Aff. ¶¶ 5–6, Pl.'s Ex. 1, ECF No. 39-2.) The parties agree, however, that it was the practice of the local State's Attorney's Office to return documents submitted with an arrest warrant application to the police department. (Pl.'s Stat. ¶ 33a.) Vieux herself does not remember whether or not she reviewed DelVecchio's police report, though she remembers Stonick's case. (Defs.' Stat. ¶ 31.)

As the Westport Police Department's press liaison, Lieutenant Farrell shared news of Stonick's arrest with local news outlets, relying on information obtained during DelVecchio's investigation. (Farrell Aff. ¶¶ 3–4, Defs.' Ex. F, ECF No 38-7.) Though the parties dispute the

substance of Farrell's press statements, they agree that following Stonick's denial of her involvement in the case, Farrell "expressed that he was 'confident with our investigation that we did arrest the right person,'" noting Paccha's identification of Stonick from the photo lineup. (Pl.'s Stat. ¶¶ 36a–37a.) Farrell was not aware that Stonick had attempted to contact DelVecchio the day before DelVecchio applied for the arrest warrant, as well as sometime several days after the warrant was signed. (Defs.' Stat. ¶ 40.)

Stonick ultimately denied having purchased the gift card and in response the Westport Chief of Police asked Lieutenant Jillian Cabana ("Cabana") to investigate. (*Id.* ¶ 42.) From her search using the "CLEAR" database, Cabana discovered another woman approximately Stonick's age named Jayna Stonick ("Jayna"), who lived at the same address and who is Stonick's sister. (*Id.* ¶¶ 43–44, 49.) The CLEAR database was used by the detective bureau but not patrol officers; DelVecchio was thus unfamiliar with it at the time of her investigation and her initial search had not yielded Jayna's name. (*Id.* ¶¶ 10, 45.) Cabana attempted without success to reach Jayna by phone. (*Id.* ¶ 46.) Jayna left the United States on September 10, 2016 and has not returned to Connecticut. (*Id.* ¶¶ 53–54.) In communications with Stonick through a messaging application following Stonick's arrest, Jayna denied having gone on the date with Paccha. (*Id.* ¶ 49.)

After Stonick's attorney went to Paris to meet with Jayna in late October 2016, however, Stonick began to believe that the woman on the date was her sister. (*Id.* ¶¶ 48, 50.) On October 28, 2016, Ziskroit, the waiter, was administered another photo lineup in which he identified Jayna as the suspect. (Pl.'s Stat. ¶ 60.) Two days later, a new photo array was administered to Paccha that did not include Stonick's photo, and "[h]e stated that he was 100% positive it was the girl he picked in the first photo array which was identified as Stonick." (Incident Report at 17.) Paccha was also shown a photo from Jayna's Facebook page, which Paccha indicated was not the suspect.

(*Id.*)  On November 8, 2016, Cabana received an email containing an unsigned statement from someone claiming to be Jayna, which averred that she went on the date with Paccha and was responsible for the gift card purchase.  (Defs.' Stat. ¶ 51.)  Stonick came to believe that Jayna used Stonick's picture on the dating website, which is why she thinks that Paccha chose Stonick's image from the photographic lineup.  (*Id.* ¶ 52.)  The charges against Stonick were dismissed on November 20, 2017.  (Pl.'s Stat. ¶ 65; Pl.'s Ex. 5, ECF No. 39-6.)  The parties dispute whether Stonick has suffered ill effects as a consequence of these events.  Stonick declares that she was suspended from her job without pay as a result of the arrest and believes that her career growth will be hindered by the presence of negative articles on the Internet.  (Pl.'s Stat. ¶ 55a.)

Stonick asserts claims against DelVecchio pursuant to 42 U.S.C. § 1983 and the common law of malicious prosecution.  She alleges that DelVecchio violated her Fourth Amendment rights by arresting her without probable cause and by submitting an affidavit in support of a warrant application that "omitted materially exculpatory information, contained false representations and relied upon a tainted photo array identification of Stonick by the victim."  (Pl.'s Mem. at 1.)  DelVecchio argues that Stonick's Fourth Amendment claim fails as a matter law because: (1) there was probable cause for Stonick's arrest; (2) the omissions from DelVecchio's affidavit were not material and, even if material, were included in the police report submitted with the warrant application and thus do not undermine the finding of probable cause; and (3) DelVecchio is entitled to qualified immunity.  (Defs.' Mem. at 9.)  Stonick's malicious prosecution claim similarly implicates the contested question of whether her arrest was supported by probable cause.  DelVecchio argues that this claim must fail for the additional reason that the record lacks any evidence suggesting that she acted with malice.  Finally, Stonick alleges a defamation claim against Lieutenant Farrell based on his purportedly false statements to the media. Farrell submits

that this claim is deficient because his statements were true and because the statements were protected by qualified privilege and are therefore not actionable.[4]

**Standard of Review**

The standard under which the Court reviews motions for summary judgment is well-established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact is one that 'might affect the outcome of the suit under the governing law' and as to which 'a reasonable jury could return a verdict for the nonmoving party.'" *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The inquiry conducted by the Court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. Accordingly, the moving party satisfies its burden under Rule 56 "by showing . . . that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (*per curiam*) (quotation marks omitted). Once the movant meets its burden, "[t]he nonmoving party must set forth specific facts showing that there is a genuine issue for trial." *Irizarry v. Catsimatidis*, 722 F.3d 99, 103 n.2 (2d Cir. 2013) (quoting *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008)). "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading" to establish a disputed fact. *Wright v. Goord*, 554 F.3d 255, 266 (2d

---

[4] Stonick also asserted a claim pursuant to Sections 7 and 9 of Article I to the Connecticut Constitution based on her contention that DelVecchio lacked probable cause for her arrest, though she has conceded to the entry of summary judgment for DelVecchio on this claim. (Pl.'s Mem. at 22.)

Cir. 2009). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). The standard thus requires "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted).

In assessing the presence or absence of a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian,* 680 F.3d 234, 236 (2d Cir. 2012) (*per curiam*) (quoting *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)). "In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).

**Discussion**

### Fourth Amendment Claim

"The Fourth Amendment prohibits 'unreasonable searches and seizures.'" *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) (quoting U.S. Const. amend. IV.) "For a seizure to be reasonable, it must generally be supported by probable cause." *Mara v. Rilling*, 921 F.3d 48, 69 (2d Cir. 2019). "Probable cause 'to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Martel v. Town of S. Windsor*, 562 F. Supp. 2d 353, 358 (D. Conn. 2008), *aff'd*, 345 Fed. App'x 663 (2d Cir. 2009) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). An arrest or search authorized by a judicial officer upon a finding of probable cause carries a presumption

of reasonableness. *Ganek*, 874 F.3d at 81. This "presumption can be defeated by showing that a defendant (1) 'knowingly and deliberately, or with a reckless disregard of the truth,' procured the warrant, (2) based on 'false statements or material omissions,' that (3) 'were necessary to the finding of probable cause.'" *Id.* (quoting *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994)). "Recklessness may be inferred where the omitted information was 'clearly critical' to the probable cause determination." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991) (citations omitted).

As indicated previously, because a judicial officer made a finding of probable cause for Stonick's arrest, DelVecchio asserts that her conduct was presumptively reasonable. She further asserts that the information that Stonick claims was omitted from or misstated in DelVecchio's affidavit was not material and therefore could not undermine that presumption of reasonableness. DelVecchio additionally argues that a "corrected affidavit" that included the allegedly omitted or misstated information would still provide an objective basis to sustain the probable cause determination. Alternatively, DelVecchio asserts that she did not actually omit or misstate any information in her warrant application because all of the relevant facts were included in her police report. Finally, DelVecchio argues that she is entitled to qualified immunity.[5]

### There is a Triable Issue as to Whether Stonick's Arrest Was Supported by Probable Cause

As discussed above, the inquiry for the Court is whether a reasonable factfinder could find that DelVecchio: (1) knowingly and deliberately or recklessly procured the warrant for Stonick's arrest (2) in reliance upon material omissions or false statements (3) that were necessary to the

---

[5] "[B]ecause there cannot be an allegation of a constitutional violation where probable cause justifies an arrest and prosecution," *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013), the Court will first address whether there exists a triable issue as to whether any purported omissions or misstatements in DelVecchio's arrest warrant application undermined the presumption of reasonableness sustaining the probable cause determination before addressing the question of qualified immunity.

probable cause determination. *Ganek*, 874 F.3d at 81. The Court will address the first two prongs of this inquiry before separately addressing the question of probable cause.

DelVecchio asserts that Paccha's statements to DelVecchio, to include his positive identification of Stonick from the photographic lineup, were sufficient to establish probable cause for DelVecchio to apply for the arrest warrant. "An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995). Here, it is undisputed that Paccha selected Stonick's picture from a photographic array only days after the incident. However, Paccha also forwarded the picture of "Sophie" from the online dating site to DelVecchio via email, and DelVecchio testified that she believed the picture of "Sophie" on the dating site was a photo of Stonick. (DelVecchio Dep. at 65:15.) Thus, Stonick argues, Paccha's admission that he realized while still on the date with the suspect that she was not the "Sophie" from the online dating site significantly undermines the veracity or reliability of his identification of Stonick in the photo array.

More specifically, although DelVecchio testified that she thought that Stonick was the person in the "Sophie" picture from the dating website (DelVecchio Dep. at 65:15), her affidavit acknowledges "[t]hat while pumping Stonick's gas [during the date], Paccha noticed Stonick removed the large sunglasses she had been wearing, and was not the same female sent in the profile picture on [the dating website.]"[6] (DelVecchio Aff. ¶ 4; *see also* DelVecchio Response to Pl.'s Interrogs. # 8 ("Mr. Paccha also explained that the person depicted in the photograph of 'Sophie'

---

[6] Also problematic with DelVecchio's affidavit is that it is written in a fashion that presumes the identification of Stonick as the perpetrator, rather than first establishing the basis upon which such identification came to be believed. If for no other reason, and there are others, the affidavit is misleading.

on her Badoo profile, which he e-mailed to me, was not the person he had met on the dinner date on August 17, 2016.").) Yet if Paccha also reported to DelVecchio that the woman in the "Sophie" profile *was* the woman with whom he had gone on the date, which Defendants simultaneously represent to be the case (*see* Defs.' Stat. ¶ 14), then his credibility with respect to any identification, whichever one might turn out to be accurate, is significantly compromised. Given the persistence of this mutually exclusive evidence—from which it can be reasonably inferred that Paccha both identified Stonick from a photo array and simultaneously rejected a different photograph of Stonick as the perpetrator—the Court concludes that Stonick has raised a genuine issue as to whether a reasonable officer would have acted on these contradictions and, if so, whether DelVecchio knowingly omitted them from her affidavit.[7]

Paccha's credibility aside, Stonick also asserts that DelVecchio purposefully omitted Ziskroit's failure to identify Stonick from the photographic lineup from her affidavit and falsely characterized Ziskroit's statements as implicating Stonick in the crime. Indeed, DelVecchio stated in the warrant application that Ziskroit stated that he was "Stonick's waiter on 8/17/16 and that Stonick also came back to the restaurant the following two nights, (08/18 and 08/19), with two different men and used the $300 gift card she had purchased with Paccha's debit card." (DelVecchio Aff. ¶ 11.) It appears undisputed, however, that Ziskroit never identified the woman who accompanied Paccha to the restaurant by name. In fact, he identified a different woman altogether from the photographic lineup. As such, the affidavit, as written, is simply wrong and

---

[7] Stonick also argues that Paccha's prior exposure to Stonick's photo through the online dating site rendered the photographic array unduly suggestive. While "[a]n identification cannot be used to support probable cause if the identification procedure was so defective that probable cause could not reasonably be based upon it," *Dufort v. City of New York*, 874 F.3d 338, 348 (2d Cir. 2017) (quotation marks omitted), Stonick points to no evidence indicating that the manner with which the array was presented was "inherently prejudicial," or that Stonick's photograph "stood out from all of the other photographs as to 'suggest to an identifying witness that [she] was more likely to be the culprit,'" *United States v. Thai*, 29 F.3d 785, 808 (2d Cir. 1994) (quoting *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986)). The Court thus declines to find a disputed issue in whether or not the photo array itself was improper so as rebut the presumption of probable cause at this stage of the litigation. Stonick is free to pursue this claim at trial.

misleading in this regard. These omissions and misstatements, Stonick argues, are germane to both the reasonableness of relying on Paccha's identification, as well as DelVecchio's conduct in submitting the affidavit without this information.

DelVecchio responds that she did not omit this information from the warrant application or otherwise proffer a material misrepresentation because the information concerning Ziskroit's failure to identify Stonick was included in the incident report submitted to the state prosecutor, which she attached to her submission.[8] (Defs.' Mem. at 13.) As discussed previously, however, the parties dispute whether DelVecchio actually included the report in the application for the arrest warrant and Attorney Vieux, who submitted DelVecchio's warrant application, does not remember either way whether she reviewed the incident report in this case. (Defs.' Stat. ¶ 31.) Viewing the evidence in the light most favorable to Stonick, she has raised at least a permissible inference that the incident report was not submitted with the warrant application. Moreover, even if the evidence conclusively established that the incident report had been submitted, the report does not identify the contradictions inherent in Paccha's account discussed above. The incident report states that, according to Paccha, the woman in the "Sophie" picture "was not who he had met in person on 08/17." (Incident Report at 7.) It does not reveal that Paccha also sent a picture of the "Sophie" profile to DelVecchio in which he equated the photo with the suspect.

The Court therefore concludes that there exists a triable issue as to whether DelVecchio knowingly or recklessly procured the warrant in reliance on material omissions or representations. As noted above, recklessness can be inferred from a finding that the omissions or inconsistencies were "'clearly critical' to the probable cause determination," *see Rivera*, 928 F.2d at 604, which,

---

[8] The submission of the report to the prosecutor may be relevant to the factfinder's assessment of DelVecchio's *mens rea* when she sought the arrest warrant. It has no bearing, however, on the issue of whether probable cause to arrest existed because there is no evidence that it was presented to the judicial authority, even assuming *arguendo* that the prosecutor received the report.

in these circumstances, the Court deems an inquiry to be resolved by the trier of fact, *see Southerland v. City of New York*, 680 F.3d 127, 148 (2d Cir. 2012) ("Although these alleged misrepresentations may turn out to be no more than accidental misstatements made in haste, the plaintiffs have nonetheless made a 'substantial preliminary showing' that [the defendant] knowingly or recklessly made false statements in his application" sufficient to undermine the presumption of reasonableness at the summary judgment stage) (citation omitted).

### *The Hypothetical Corrected Affidavit*

The Court next considers whether the purported omissions and misstatements were "necessary" to the probable cause determination. *See Ganek*, 874 F.3d at 81. Stonick contends that correcting the affidavit to account for these omissions and misrepresentations eliminates the probable cause needed to sustain the warrant application. DelVecchio argues to the contrary. In assessing probable cause, courts look to the totality of the circumstances and examine "plainly exculpatory evidence alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest," or, in this situation, to seek a warrant for the Plaintiff's arrest. *Stansbury*, 721 F.3d at 93 (quotation marks omitted). In this context the Court must imagine "a hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information." *Ganek*, 874 F.3d at 82 (citing *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993) and *Escalera v. Lunn*, 361 F.3d 737, 743–44 (2d Cir. 2004)). "If probable cause is lacking after such correction, then the false statement was 'necessary' to secure issuance of the warrant." *Id.* The "corrected" affidavit in this case would include the following: (1) Paccha sent DelVecchio an email containing the "Sophie" profile picture in which he claimed that "Sophie" was the woman on the date; (2) DelVecchio believed that the profile photo of "Sophie" was a

photo of Stonick; (3) Paccha also reported, as set forth in the existing affidavit, "[t]hat while pumping [the suspect's] gas, Paccha noticed [the suspect] removed the large sunglasses she had been wearing, and was *not* the same female sent in the profile picture" (DelVecchio Aff. ¶ 4) (emphasis added); (4) Ziskroit was administered a photo array and identified a different female who is not Stonick as the suspect; and (5) Ziskroit never identified Stonick as the woman he saw at the restaurant, with Paccha or thereafter.[9]

Considering the integral role that Paccha's positive identification may have played in supporting the probable cause determination set forth in DelVecchio's affidavit, the Court concludes that the omissions identified by Stonick all "bear upon the reliability of the overall information provided," and thus that a reasonable factfinder could find that they were necessary to the probable cause determination. *McColley v. Cty. of Rensselaer*, 740 F.3d 817, 826 (2d Cir. 2014); *see also Southerland*, 680 F.3d at 144 (concluding that the question of whether the court "would have issued the order had a corrected affidavit been presented to it" could not be determined as a matter of law). Indeed, the confluence of material facts in dispute and previously discussed necessitates the conclusion that this is one of those "doubtful cases" in which "summary judgment is inappropriate." *McColley*, 740 F.3d at 823 (quoting *Velardi*, 40 F.3d at 574).

Accordingly, the question of whether DelVecchio violated Stonick's Fourth Amendment rights is reserved to the jury, unless DelVecchio is entitled to qualified immunity, which the Court addresses next.

---

[9] In addition, the corrected affidavit would refer to "the suspect" when detailing the nature of the offense and the victim's complaint in those paragraphs where the affiant was not specifying an actual identification of Stonick. As noted *supra*, the affidavit as drafted presupposes Stonick's involvement in the criminal activity and is misleading for this reason as well.

### *Qualified Immunity*

"[Q]ualified immunity protects government officials from suit if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The shield of qualified immunity insulates law enforcement officials from liability in their individual capacities unless the plaintiff demonstrates "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ganek*, 874 F.3d at 80 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow*, 457 U.S. at 818)). With respect to the first issue, the Court has already concluded that the question of whether DelVecchio violated Stonick's Fourth Amendment rights must be resolved by a trier of fact. As to the second inquiry, the right to be free from unreasonable seizures, *i.e.*, an arrest not supported by probable cause, was "clearly established" at the time DelVecchio sought Stonick's arrest. *See, e.g.*, *Yorzinski v. Imbert*, 39 F. Supp. 3d 218, 227 (D. Conn. 2014) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). However, "[i]n this Circuit, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Southerland*, 680 F.3d at 141 (quoting *Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010) (brackets omitted)).

On the issue of "objective reasonableness," the Second Circuit has provided, at least arguably, conflicting guidance. In some cases, the Second Circuit has instructed courts to "look to the hypothetical contents of a 'corrected' application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to

support *arguable* probable cause to make the arrest as a matter of law." *Escalera*, 361 F.3d at 743–44 (emphasis added). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* at 743 (quotation marks omitted); *see also Ganek*, 874 F.3d at 82 (explaining that if the corrected affidavit lacks probable cause, defendants are still entitled to immunity "if a similarly situated law enforcement official could have held an objectively reasonable—even if mistaken—belief that the corrected affidavit demonstrated the necessary probable cause"). The Second Circuit has recognized in this context that "arguable probable cause" presents an "analytically distinct test for qualified immunity [that] is more favorable to the officers than the one for probable cause[.]" *See Escalera*, 361 F.3d at 743.

In other cases, however, the Second Circuit has stated that "a court may grant summary judgment to a defendant based on qualified immunity only if the evidence, viewed in the light most favorable to the plaintiffs, discloses no genuine dispute that a magistrate would have issued the warrant on the basis of the corrected affidavits." *Southerland*, 680 F.3d at 144 (quotation marks omitted); *see also Golino v. City of New Haven*, 950 F.2d 864, 872 (2d Cir. 1991) (holding, in denying qualified immunity under the corrected affidavits doctrine, that "[t]he weight that a neutral magistrate would likely have given the above information, along with the other information that was concealed or misrepresented, is not a legal question but rather is a question to be resolved by the finder of fact"). This standard essentially duplicates the inquiry already undertaken by this Court concerning whether the affidavit's alleged omissions or misstatements were material and if so, whether they were "necessary" to the probable cause determination. *See McColley*, 740 F.3d at 831 (Calabresi, *J.*, concurring) ("Disagreements about whether a corrected affidavit establishes

probable cause are identical to disputes over how much weight a magistrate would have given to the omitted evidence."). Applying this more stringent standard would therefore necessitate a finding that DelVecchio is not, by way of summary judgment, entitled to qualified immunity.

Relying upon the immunity-friendly "arguable probable cause" standard, DelVecchio maintains that even a hypothetical corrected affidavit that included Ziskroit's identification of a different suspect would not defeat the "arguable" probable cause for Stonick's arrest because Ziskroit's failure to identify Stonick does not weaken Paccha's credibility so as to undermine the reasonableness of DelVecchio's determination. DelVecchio also relies on Paccha's subsequent declaration that he was "100[%] positive [the suspect] was the girl he picked in the first photo array," *i.e.*, Stonick. (Defs.' Reply at 2–3, ECF No. 42 (citing Incident Report at 17).) DelVecchio further notes that Paccha's identification was corroborated by the fact that the suspect's vehicle was registered at the address at which Stonick resided. Stonick, by contrast, asserts that "[t]he plainly exculpatory and omitted fact that Ziskroit never identified Stonick as the suspect weakens the basis for probable cause." (Pl.'s Mem. at 14.) DelVecchio's argument does not account for the above-discussed mutually exclusive and contradictory identifications by Paccha. Nor does it address the erroneous statement in DelVecchio's affidavit that Ziskroit identified Stonick by name. (*See* DelVecchio Aff. ¶ 11.) And Stonick is correct that Ziskroit's identification of a person other than Stonick is not simply additional information, but information that directly contradicts Paccha's identification. *Cf. Garcia v. Gasparri*, 193 F. Supp. 2d 445, 451 (D. Conn. 2002) (holding that probable cause remained under hypothetical corrected affidavit where the alleged omissions did "not contradict the information contained in [the officer's] application for the arrest warrant.").

While the "arguable" probable cause standard often requires that immunity be granted, the Court does not believe the rule was intended to "swallow[] all such doubtful cases, ensuring that . . . a jury trial will in fact never be realized." *See McColley*, 740 F.3d at 831–32 & n.8 (Calabresi, *J.*, concurring). Moreover, it is precisely the Court's uncertainty as to whether a reasonable officer in DelVecchio's situation could have believed that a corrected affidavit established the requisite probable cause that the Court perceives the issue as falling within the jury's province. *See Escalera*, 361 F.3d at 743–44. The case is simply too close to call on summary judgment. Given the details of the investigation and the presentation of the warrant application as set forth above, the Court concludes that under either standard for assessing "objective reasonableness," the Court cannot determine that DelVecchio is entitled to qualified immunity as a matter of law.

The motion for summary judgment as to Stonick's Section 1983 claim against DelVecchio in her individual capacity is accordingly denied.[10]

**Malicious Prosecution**

"Under Connecticut law, a plaintiff asserting malicious prosecution must prove that: '(1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice.'" *Spak v. Phillips*, 857 F.3d 458, 461 n.1 (2d Cir. 2017) (quoting *Brooks v. Sweeney*, 299 Conn. 196, 210–11, 9 A.3d 347 (2010)). "Probable cause has been defined as the knowledge of facts sufficient to justify a reasonable [person] in the belief that he has

---

[10] Stonick purports to bring her claims against the Defendants in their individual and official capacities. (*See* SAC ¶¶ 4–5.) However it is well established that "[a] § 1983 claim against a municipality or against an official sued in his official capacity . . . cannot be sustained unless the plaintiff shows that the violation of her federal rights was the result of a municipal custom or policy." *Lore v. City of Syracuse*, 670 F.3d 127, 168 (2d Cir. 2012) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)). Stonick does not allege that DelVecchio violated Stonick's rights as a result of a custom or policy of the Westport Police Department and accordingly DelVecchio is entitled to summary judgment on any official capacity claim Stonick asserts for a violation of her Fourth Amendment rights.

reasonable grounds for prosecuting an action." *Brooks*, 299 Conn. at 211 (quotation marks and citation omitted). "Malice may be inferred from lack of probable cause." *Falls Church Grp., Ltd. v. Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 94, 912 A.2d 1019 (2007); *see also Mulligan v. Rioux*, 229 Conn. 716, 746, 643 A.2d 1226 (1994) ("Want of probable cause and malice, combined, are essential. If the evidence supports the former, we need not consider the latter, since it may be inferred. Thus, having determined that the defendants lacked probable cause as a matter of law, we conclude that the jury could reasonably have inferred that the defendants acted with malice") (quotation marks and internal citations omitted).

Defendants do not contest satisfaction of the first two elements but argue that the record lacks evidence that DelVecchio acted without probable cause, for the reasons discussed previously, or that DelVecchio acted with malice. Stonick incorporates her prior arguments in arguing that the corrected affidavit reveals the absence of probable cause. She further submits that "the element of malice is shown by DelVecchio's reckless disregard for the clearly established constitutional rights of Stonick and the statutory duty of police officers to disclose exculpatory information to the prosecutorial official," citing Conn. Gen. Stat. § 54-86c. (Pl.'s Mem. at 26–27.)

For the reasons discussed in the context of Stonick's Fourth Amendment claim, the Court concludes that Stonick "has made the requisite showing that a reasonable jury could find that the entire set or some subset of the omissions and false statements in the arrest warrant affidavit was material to a finding of probable cause and, moreover, that those omissions and false statements were made knowingly, intentionally or with reckless disregard for the truth." *Golino v. City of New Haven*, 761 F. Supp. 962, 968–69 (D. Conn.), *aff'd*, 950 F.2d 864 (2d Cir. 1991); *see also Acevedo v. Sklarz*, 553 F. Supp. 2d 164, 169 (D. Conn. 2008) (upholding denial of summary

judgment on reconsideration where "the Fourth Amendment and related claims . . . all turn on whether probable cause (or at the very least arguable probable cause) existed or not").

Accordingly, the motion for summary judgment as to the claim of malicious prosecution is denied.

**Defamation**

"At common law, to establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Gleason v. Smolinski*, 319 Conn. 394, 430, 125 A.3d 920 (2015) (quotation marks and brackets omitted). "A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* at 431 (quoting *Cweklinsky v. Mobil Chem. Co.*, 267 Conn. 210, 217, 837 A.2d 759 (2004)). "[T]o be actionable, the statement must be false . . . and under the common law, truth is an affirmative defense to defamation . . . the determination of the truthfulness of a statement is a question of fact for the jury." *Id.* (quoting *Cweklinsky*, 267 Conn. at 228–29). The statement must also "convey an objective fact, as generally, a defendant cannot be held liable for expressing a mere opinion." *Crismale v. Walston*, 184 Conn. App. 1, 18, 194 A.3d 301 (App. Ct. 2018).

"Defamation is comprised of the torts of libel and slander: slander is oral defamation and libel is written defamation." *Skakel v. Grace*, 5 F. Supp. 3d 199, 206 (D. Conn. 2014). Defamation is "actionable *per se*" if it either "charges a crime which involves moral turpitude or to which an infamous penalty is attached," or it "injure[s] a man in his profession and calling." *Id.* (quoting

*Gambardella v. Apple Health Care, Inc.*, 86 Conn. App. 843, 850–51, 863 A.2d 735 (App. Ct. 2005)). "[T]he modern view" of a crime to which an infamous penalty is attached "is that the crime be a chargeable offense which is punishable by imprisonment." *Silano v. Cooney*, 189 Conn. App. 235, 245, 207 A.3d 84 (App. Ct. 2019) (quoting *Battista v. United Illuminating Co.*, 10 Conn. App. 486, 493, 523 A.2d 1356 (App. Ct. 1987)). "Once the plaintiff has established that the words are false and actionable per se, barring any statutory provision to the contrary, she is entitled under Connecticut law to recover general damages without proof of special damages." *Id.* at 242 (quoting *Miles v. Perry*, 11 Conn. App. 584, 602, 529 A.2d 199 (App. Ct. 1987)).

### Statements from the Criminal Arrest Synopsis

Stonick rests her defamation claim principally on four statements that Farrell sent to the press in a written "Criminal Arrest Synopsis" on October 17, 2016:

(1) The victim and Stonick had dinner at Finalmente Trattoria, 165 Post Road East in Westport on 08/17/16.

(2) The victim paid for the meal, and Stonick requested a $300.00 gift card to be paid by the victim's credit card without the victim knowing.

(3) Stonick reportedly excused herself from the table to use the restroom, and asked the manager to complete the gift card charge.

(4) Stonick then returned to the restaurant on 08/18/16 and 08/19/16 using the gift card she purchased fraudulently using the victim's credit card information.

(Pl.'s Mem. at 22; *see also* Synopsis, Pl.'s Ex. 2, ECF No. 39-3.) Farrell responds that when taken in context, these statements are true, because they convey the facts as relayed by Paccha, the crime victim. Farrell notes that the statements are prefaced by the report that "[o]n August 23, 2016, Westport Officers met the victim of this incident at Westport Police Headquarters regarding a larceny complaint," and are situated among other true statements about Paccha's provision of the license plate number and positive identification of Stonick from the lineup. (Defs.' Reply at 8–9.)

Farrell also argues that his statements did not charge Stonick with a crime of moral turpitude nor harm her in her profession and contend that she has accordingly not demonstrated defamation *per se*—thus requiring her to "plead and prove specific damages to prevail on her defamation claim." (Defs.' Mem. at 30.)

This latter argument is meritless. Farrell's arrest synopsis explicitly charges Stonick with larceny in the sixth degree and illegal use of a credit card—crimes that are punishable by imprisonment. *See* Conn. Gen. Stat. § 53a-125b(b) (sixth-degree larceny is a class C misdemeanor); *id.* §§ 53a-128d; 53a-128i(a) (credit card crimes are class A misdemeanors if the value of the property at issue does not exceed $500 in a six-month period); *id.* § 53a-36 (Class A and class C misdemeanors allow for terms of imprisonment "not to exceed one year" and "not to exceed three months," respectively). These are therefore crimes "to which an infamous penalty is attached." *See Wade v. Kay Jewelers, Inc.*, No. 3:17-CV-990 (MPS), 2018 WL 4440532, at *5– *6 (D. Conn. Sept. 17, 2018) ("[B]ecause Wade has alleged defamatory statements accusing him of crimes potentially punishable by imprisonment, *i.e.* larceny or illegal use of a credit card, *see* Conn. Gen. Stat. §§ 53a-119, 53a-128c *et seq.*, . . . reputational harm is conclusively presumed."); *Silano*, 189 Conn. App. at 243–45 (explaining that a crime need not also be a crime of moral turpitude to constitute defamation *per se* so long as it implicates an infamous penalty).

As to Farrell's contention that, when viewed in context, his statements are non-actionable because they are true, such a determination cannot be made as a matter of law at this stage of the proceedings. Indeed, the jury is entitled to reject this contention. While the arrest synopsis opens by stating that Westport Officers met with Paccha regarding his larceny complaint, it continues, "[t]he victim stated he was on a first date with a woman named 'Sophie,' *who was later identified by officers as Katherine Stonick*." (Synopsis, Pl.'s Ex. 2 (emphasis added).) It then sets forth the

"facts" underlying Stonick's purported criminal actions, as captured in the four statements on which Stonick relies. Except for the use of the word "reportedly" in the third sentence, the synopsis arguably contains no qualification that the statements were mere allegations. When read in context, therefore, the synopsis is susceptible to competing interpretations, at least one of which supports the defamation claims. *See Wade*, 2018 WL 4440532, at *6 (rejecting defendant's argument that "confusing an innocent person with a guilty person does not constitute a defamatory statement identifying the innocent person," as "deliberate falsity is not required to prove defamation *per se*.") (brackets omitted). Such competing interpretations require that the determination of truthfulness be resolved by the jury. *See, e.g.*, *Gleason*, 319 Conn. at 431.

### Farrell's Statement Regarding Stonick's Alleged Failure to Respond to the Police

Stonick also cites Farrell's October 27, 2016 email to a reporter at Channel 3 News, in which Farrell stated, in response to an inquiry about Stonick's claim of false arrest, that the Westport Police were not dropping the charges against her. In that email, Farrell stated that Stonick "never responded to the investigating officer," *i.e.*, DelVecchio. (*See* Farrell Email, Pl.'s Ex. 7, ECF No. 39-8). Farrell acknowledges that this statement was false at the time it was made. He asserts however that the statement is not actionable because it is protected by qualified privilege insofar as he made the statement during an ongoing investigation. Farrell urges the Court to apply qualified privilege to all of the allegedly defamatory statements, including the four statements discussed above.

Statements made in connection with police investigations are generally not actionable because they are protected by qualified privilege. *See, e.g.*, *Hohmann v. GTECH Corp.*, 910 F. Supp. 2d 400, 405 (D. Conn. 2012) (citing *Hopkins v. O'Connor*, 282 Conn. 821, 832, 925 A.2d 1030 (2007)). This quasi-judicial privilege encompasses communications "made directly to a

tribunal, but also to those preparatory communications that may be directed to the goal of the proceeding." *Hopkins*, 282 Conn. at 832; *see also Kelley v. City of Hamden*, No. 3:15-CV-00977 (AWT), 2017 WL 3763839, at *3 (D. Conn. Aug. 30, 2017) (applying the privilege to "information contained in police reports and the arrest warrant application"). "When considering whether a qualified privilege protects a defendant in a defamation case," the first inquiry "is whether the privilege applies, which is a question of law," while "[t]he second is whether the applicable privilege nonetheless has been defeated through its abuse, which is a question of fact." *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 628, 969 A.2d 736 (2009) (citations omitted).

Farrell cites to no authority concluding that communications to the press are in any way "directed toward the achievement of the objects of litigation or any other proceedings," as is required to fall within the privilege's scope. *See Hopkins*, 282 Conn. at 849. The Court therefore declines to find, as a matter of law, that Farrell's statements are protected by qualified privilege and the motion for summary judgment is accordingly denied as to the defamation claims.

**Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is DENIED as to Stonick's Section 1983 claim against DelVecchio in her individual capacity and GRANTED to the extent Stonick alleges a Section 1983 claim against DelVecchio in her official capacity, DENIED as to Stonick's state law claims for malicious prosecution and defamation, and GRANTED as to Stonick's claim against Officer DelVecchio under the Connecticut Constitution.

**SO ORDERED** at Bridgeport, Connecticut, this 7th day of February 2020.


    */s/ Kari A. Dooley*
    KARI A. DOOLEY
    UNITED STATES DISTRICT JUDGE